**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Luke W. Sironski-White (State Bar No. 348441)
Ryan B. Martin (State Bar No. 359876)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ndeckant@bursor.com
          lsironski@bursor.com
          rmartin@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DESHAUN HACKETT, individually and on behalf of all others similarly situated, | Case No. 3:25-CV-03297-RFL |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| SKYNET INDUSTRIES, INC. d/b/a BUMBLE BEE BOTANICALS, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Deshaun Hackett ("Plaintiff") brings this action on behalf of himself, and all others similarly situated against Defendant Skynet Industries, Inc. d/b/a Bumble Bee Botanicals ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a civil class action lawsuit against Defendant for false, misleading, deceptive, and negligent sales practices regarding its kratom powder, capsule, 7-hydroxymitragynine products (the "7-OH Products"), and liquid extract products (collectively, the "Products").[1] Kratom is a dried leaf that is sold as a loose powder, packaged into capsules, or made into an extract. However, what reasonable consumers do not know, and Defendant fails to disclose, is that the "active ingredients" in kratom are similar to opioids. That is, kratom works on the exact same opioid receptors in the human brain as morphine and its analogs, has similar effects, and critically, has the same risk of physical addiction and dependency, with similar withdrawal symptoms.

2. The opiate-like effects on the brain are produced by two active alkaloids: mitragynine and 7-hydroxymitragynine ("7-OH"). While both active alkaloids in kratom interact with the opioid receptors, 7-OH is substantially more potent than mitragynine. Indeed, some studies have shown that 7-OH is ten times more potent than morphine in activating the mu-opioid receptor, which is the receptor associated most strongly with opioid addiction.

3. When reasonable consumers think of opiates and opioids, they think of heroin, fentanyl, hydrocodone, oxycodone, and morphine; they do not expect that the "wellness" product bought at their local corner store operates like an opioid, with similar addiction and dependency

---

[1] The Products include any and all Bumble Bee Botanicals products, including the varying kratom strains: "Red Maeng Da Kratom," "Red Bali Kratom," "Red Bentuangie Kratom," "Red Borneo Kratom," Green Maeng Da Kratom," "Green Malay Kratom," "Green Hulu Kapuas Kratom," "Green Borneo Kratom," "Gold Bali Kratom," "White Maeng Da Kratom," "White Thai Kratom," "White Borneo Kratom;" the kratom extracts: "Bali Kratom Extract," and "Maeng Da Kratom Extract;" and all other of their kratom powders, pills, capsules, and liquids. Additionally, the Products also includes the Bumble Bee Botanicals 7-OH Products: "Bee Cozy," "Bee Bright," "Bee Productive."

risks. Kratom is perniciously addictive – on an entirely different level than caffeine or nicotine – and it has sunk its hooks into tens of thousands of unsuspecting consumers and caused them serious physical, psychological, and financial harm. Defendant has intentionally and negligently failed to disclose these material facts anywhere on its labeling, packaging, or marketing materials, and it has violated warranty law and state consumer protection laws in the process.

4. Defendant relies on its Products' innocuous packaging and the public's limited knowledge about kratom and its pharmacology to get users addicted, while reaping profits along the way. Reasonable consumers do not expect the liquid extract bottles, kratom powder, bottles of kratom capsules, or 7-OH Products which they can purchase at Defendant's store fronts, to contain products with the same addictive potential of morphine and its analogs. And when it comes to "7-Hydroxymitragynine," a derivative of kratom with a torturously complex name, the public is even less aware of it and its negative effects. Defendant relies on this ignorance and does nothing to correct it. Such activity is outrageous and is in contravention of California law and public policy.

5. Defendant and its officers, Andrew Graham and Linda Kline, have engaged in a systemic effort to peddle an addictive substance to unsuspecting and oftentimes vulnerable consumers. Plaintiff seeks relief in this action individually, and on behalf of similarly situated purchasers of Defendant's Products, for: (i) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; (ii) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code § 1750, *et seq.*; (iii) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; (iv) breach of implied warranty; (v) unjust enrichment; and (vi) fraud by omission.

## PARTIES

6. Plaintiff Deshaun Hackett is a citizen of California who resides in Manteca, California and intends to stay there.

7. Defendant Skynet Industries, Inc.d/b/a Bumble Bee Botanicals is a California corporation with its principal place of business in La Mesa, California. Bumble Bee Botanicals has five brick and mortar store fronts in the United States that are the only locations where the Products can be purchased. These store fronts are in La Mesa, California; Carlsbad, California; San

1    Francisco, California; Boise, Idaho; and Reno, Nevada.  Defendant manufactured, marketed, and

2    sold the Products at issue at all times during the relevant Class Period.

3            8.      Plaintiff reserves the right to amend this Complaint to add different or additional

4    defendants, including without limitation any officer, director, employee, supplier, or distributor of

5    Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and

6    deceptive conduct alleged herein.

7                                  **JURISDICTION AND VENUE**

8            9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

9    1332(d) because there are more than 100 class members and the aggregate amount in controversy

10   exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a

11   citizen of a state different from Defendant.

12           10.     This Court has personal jurisdiction over the parties because Plaintiff Hackett is a

13   citizen of California and submits to the jurisdiction of the Court, and because Defendant's principal

14   place of business in in California.  Further, Defendant marketed and sold its Products to Plaintiff in

15   this District.

16           11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant

17   regularly does business in this District, and the same misrepresentations, omissions, and injures

18   giving rise to the claims alleged herein have occurred in this District (e.g., the distribution and sale

19   of kratom to Plaintiff, and Plaintiff's subsequent addiction to kratom).

20                                    **FACTUAL ALLEGATIONS**

21   **A.      Background and Pharmacology of Kratom and 7-Hydroxymitragynine**

22           12.     "Kratom" refers to the substance derived from the leaves of a tropical plant,

23   *mitragyna speciosa* (the "kratom plant"), indigenous to Southeast Asia, where it has been used in

24   herbal medicine since the 19th Century.  Kratom's first reported use in scientific literature was in

25   1836, when it was noted that Malays used kratom tree leaves as a substitute for opium.  Historic

26   use of the kratom plant was particularly well-documented in Thailand, Indonesia, and Malaysia,

27   where kratom remains popular to this day.

28

13.     Kratom is the most widely used drug in Thailand.  This popularity does not mean Thailand believes kratom is harmless.  To the contrary, Thailand understands that kratom is dangerous, as demonstrated by its ban of the substance in 1943.[2]  Kratom was also historically popular in Malaysia until it was banned in 1952 under the Poisons Act.

14.     Kratom's unknown and inconsistent effects have historically been part of its appeal. For instance, the earliest accounts of kratom characterize kratom use for both a stimulant effect during hard day-labor by chewing fresh kratom leaves, and also for an analgesic or relaxing effect by brewing kratom into a tea.

15.     In the Western world, kratom is sold online and at herbal stores, gas stations, corner stores, smoke shops, and "head" shops where it is primarily marketed as an herbal medicine or natural supplement to use to "treat" a variety of ailments (e.g., pain, mental health, opioid withdrawal symptoms), and/or to obtain a "legal" or "natural" high.

16.     To create consumable kratom products, kratom plant leaves are harvested, dried, and crushed into a fine powder that is then packaged and sold in pouches, capsules, or liquid formulations.[3]

17.     The chemicals in the kratom plant, which produce a psychoactive effect when ingested, are called "alkaloids."  "Alkaloids" are a class of various naturally occurring organic chemical compounds.  The primary alkaloids in kratom leaves responsible for kratom's effects are mitragynine ("MG") and 7-Hydroxymitragynine ("7-OH").

18.     MG and 7-OH produce a wide spectrum of effects because they interact with many different receptors in the brain.  Studies show that MG and 7-OH interact with alpha-2 adrenergic receptors (adrenaline), D2 dopamine receptors, and the serotonin receptors (5-HT2A and 5-HT2C), all of which contribute to kratom's mood-lifting and stimulant-like effects.

---

[2] In 1943, Thailand banned the possession, use, and propagation of kratom, and later banned all kratom sales, imports, exports, and consumption all together.  However, in 2021, Thailand decriminalized possession of kratom in response to a growing pressure on its justice system to fix the country's overcrowded prisons through liberalization of its drug laws.

[3] When kratom leaves are extracted into a liquid formulation, this is colloquially called a kratom "extract shot."

19.    Defendant's 7-OH Products are unique as compared to other kratom products on the market and represent a "next gen" iteration of the substance in terms of addictiveness and harm-potential.  They are an isolated and concentrated version of kratom, making 7-OH the primary active alkaloid and stripping the rest away.

20.    Compared with raw kratom, 7-OH typically only occurs in doses that are no greater than 2% of total alkaloid content (or 0.05% by weight).  In Defendant's 7-OH Products, however, 7-OH makes up 100% of the total alkaloid content.

21.    7-OH is different than MG because, although both interact with the mu-opioid receptor,[4] MG has a dramatically lower affinity for the mu-opioid receptor, whereas 7-OH has an affinity for the mu-opioid receptor that is comparable to—or greater than—opioids like Percocet, morphine, and oxycontin.  Studies have shown that when 7-OH is administered in concentrated, isolated doses, it presents a significantly greater risk of inducing physical and mental addiction in consumers than raw kratom.  Yet, consumers are largely ignorant of this fact.

22.    For instance, while both 7-OH and MG target the opioid-receptors, 7-OH's effect on the opioid receptors is approximately forty-six times that of MG, and thirteen times that of morphine.[5]

23.    Thus, kratom is by definition an "opioid," and so is 7-OH.

24.    Opioids are addictive not only because of the pleasurable effects that they produce, but also because sudden cessation of opioid use causes severe withdrawal symptoms, which users feel compelled to avoid by taking more of the drug.  The tragedy of addiction is that users want to stop but cannot.

25.    All substances that act on the opioid receptors have a high risk of addiction, and kratom is no exception.  Addiction occurs when an opioid is ingested on a regular basis and, over

---

[4] The mu-opioid receptor produces the most addictive or habit-forming effects, such as euphoria and analgesia.  For this reason, the mu-opioid receptor is known as "the gateway to addiction" because it is the receptor that all opioids interact with to produce the classic opioid high feelings of euphoria, sedation, and pain relief.

[5] *Kratom—Pharmacology, Clinical Implications, & Outlook: A Comprehensive Review*, National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7203303.

time, the user develops a tolerance to the drug that requires the user to consume an increased dose of the drug to achieve the same effects a lower dose previously had.  As these doses increase, the body becomes dependent on the drug to feel normal and function properly.  When the drug is suddenly taken away or the user tries to stop taking the drug, withdrawal occurs.  Withdrawal symptoms cause the user to feel much worse than they did before they started taking the drug and can be extremely painful and intolerable to the user.

26.    Indeed, 7-OH withdrawal symptoms are very similar to those of traditional opioid withdrawal.  These symptoms include irritability, anxiety, difficulty concentrating, depression, sleep disturbance including restless legs, tearing up, runny nose, muscle and bone pain, stomach pain, muscle spasms, diarrhea, decreased appetite, chills, inability to control temperature, extreme dysphoria, and malaise.

27.    Users typically start substances like 7-OH because of how good it makes them feel, but once addicted, they use 7-OH to avoid the pain and sickness of withdrawal.  Use is no longer about getting high, but about not feeling "sick."

**B.    Kratom and 7-OH Use and Addiction in the United States**

28.    Kratom use in the United States has exploded over the past decade.  As of 2023, the American Kratom Association estimates that kratom is a 1.5 billion dollar a year industry, with 11-15 million annual users in the United States, up from 3-5 million users in 2016.

29.    Kratom's popularity is attributed to several factors: first, kratom is marketed as a safe substitute for painkillers and so it appeals to consumers who falsely equate "natural" with "safe;" second, kratom has received media attention as a "nootropic" or "smart" drug because it is stimulating at low doses; third, kratom is widely available and unregulated within the United States; fourth, it produces a "pleasurable" high; and lastly, users are unaware of kratom's opioid-like characteristics, addiction, and withdrawal potential.

30.    However, kratom is still generally a relatively unknown substance to the average consumer, and most people have never heard of it.  Kratom sellers advertise that it is a substitute for coffee, a pain reliever, a treatment for opioid withdrawal, an antidepressant, an anti-anxiety supplement, and that it improves focus and gives users a boost of energy to get through the day.

These kratom companies universally reiterate these purported "benefits" of kratom consumption, without disclosing any of the corresponding harms of kratom use.

31.    Further, because kratom does not produce as extreme of a "high" as cocaine or heroin, it is easy for users to take kratom daily without realizing they are developing an addiction and harming themselves.  This makes kratom particularly insidious as addiction sneaks up on unsuspecting and uninformed users.

32.    As a result of kratom manufacturers, retailers, and advertisers failing to warn consumers of kratom's addictive potential, many kratom users find themselves blindsided when they stop taking kratom and find themselves facing severe withdrawal symptoms after having stopped using what they thought was a harmless supplement.  Further, because kratom is relatively unknown in the United States, there are not well-established recovery resources for addicted users to turn to for resources and aid.  Some kratom users turn to the Internet for support, and there are well-populated and very active Internet forum support groups for consumers struggling with, and recovering from, kratom addictions.

33.    The reports from addicted kratom users are heart-wrenching.  Consistent among these reports is a feeling of initial shock when users realized they had become unknowingly addicted to kratom, and how difficult it was to stop their kratom use.  Below are several accounts from the "Quitting Kratom" forum on www.reddit.com, which has over 45,000 members as of October 2024:[6]

> One user wrote: "I've been on a 50gpd [grams per day] habit for about 4 years.  Like most people here, **I was in denial that the Kratom was causing my multitude of issues. How could it be the Kratom when everyone keeps telling me how great it is?**  I made myself believe that I had underlying issues that the Kratom was helping. Spoiler: It wasn't.  **I slowly became a shell of the person I used to be. TRUE clinical depression symptoms with zero joy in my life.**  I started browsing this subreddit and reading everyone's stories and I related to every single one.  **Everyone had the same exact experience I had and at that moment I knew it was the Kratom causing my depression.**" (emphasis added).

> A gas station employee wrote: "I work at a gas station where we sell kratom such as powders, gold and silver pills and especially shots etc (you know which one I'm

---

[6] *See* https://www.reddit.com/r/quittingkratom.

talking about) **it's just mind blowing to me how many people are practically addicted and how many customers literally scavenge their money to pay for their daily shot**. Why are people so addicted especially to those shots."

Another user solicited "extract horror stories" – one user responded: "Took 2-3 shots a day for almost 2 years. How did it screw me up? Let me count the ways. Financially it was draining me, 100%! **I would estimate 60% of my hair fell out. My skin was grey. My eyes were dark. I became a hermit.** No longer wanted to do anything, including self care or hygiene. Just taking a shower was a chore I had to talk myself into the last few months. I was disgusting and did not care at all. **All I cared about was that I had enough K for tomorrow.**"

In response to the same "extract horror stories" post, another user responded: "I used [kratom extract] pills and sometimes the shots for over 5 years. I'm now 290 days clean from them. **They were so hard to kick bc of how addicting they are.** And you can just walk in the store and buy them. I was spending $45 day on this stuff. **I wasted tens of thousands of dollars on it and my life suffered.** Lots of my hair fell out and it's only now starting to grow back some, I think most of it is gone for good. I'm repairing my marriage and friendships. Everything. Stay away from this stuff."

Another user responded: "Amen. This shit got hold of me as bad as anything else I've ever done... spent WAY more money on these fucking things than real honest to God hard drugs back in the day. **Anywhere from 6-10 of these things daily for... years. Let's call it 7 at an average of $18/pop = $126/day x 30 = $3780/month = about $45k/year.** How fucking embarrassing. I made $140,000 last year living in Georgia (pretty low cost of living) and pretty regularly get busted "borrowing" money from my 10 year old son. Fuck this; I'm not living like this anymore."

About 2 years ago, another user wrote: "What a difficult journey it has been. I was a ~75 GPD [grams per day] user. **Quitting kratom was one of the hardest things I've had to do in my life.** I learned the hard way that kratom causes withdrawals on a work trip 3 years ago. I should have stopped then and there but I gave in because the RLS was so bad. … **Kratom withdrawal is seriously no joke so don't think you're the only one struggling so much.** I'm only a week free but after this experience I know for sure that I will never go back. Good luck everyone!" (emphasis added).

About 2 years ago, another user wrote a post titled *Kratom Is An Addictive Drug*. It said, in part: "It's been 23 hours since my last dose. **I just wanted to give my story hoping that it would help others see that they've been lied to, deceived and manipulated into thinking this plant is 'harmless and safe'.** As a matter of fact, reading the horror stories on this subreddit was the first step in my recovery... I started taking it almost 3 years ago after hearing about it on... well, Reddit. They touted it is a miracle plant that had all the benefits of an opioid with none of the side effects." (emphasis added).

About 19 months ago, another user wrote: "**I think the perfect word to describe Kratom addiction is 'insidious'.** Here is the definition – *'proceeding in a gradual, subtle way, but with harmful effects.'* I think this is why it takes so long to realize what is going on. There was never a rock bottom moment for me like there would be for other more conventional abused drugs. No overdose, no bad behavior, no abusiveness to my family, no DWI, etc.. - It was just a lazy, slow descent into nothingness. I was living in a groundhogs day type of existence. Wake up, go to work, leave work, buy an extract shot or 2, have dinner, drink my shot, mindlessly look at my phone and/or watch TV. Wake up and do it all over again." (italic emphasis in original, bold emphasis added).

About 12 months ago, another user wrote: "I started using k[ratom] when I had knee surgery Dec 2019 so 3 years. **I didn't want to use pain killers because I got sober from alcohol 3/6/2018 and i felt the pain killers were going to make me relapse.** I didn't know I would end up in a worst place as I am now." (emphasis added).

About 2 years ago, another user wrote: "Was in bed all day yesterday fighting withdrawals. I used to even be an athlete - strong lean and fit, until I got on [kratom] shots and extracts. Didn't even get high any more - just wanted to not feel bad."

About 4 years ago, another user wrote: "I researched kratom before using it and almost every site promoted that its harmless with healthy benefits, and that its withdrawals are like coffee for 3 days max. Information wasn't clear that kratom could become a negative addiction that takes months to recover" … "**I took something I thought was helping me for 1.5-2 years, not even knowing the downsides bc that information was so misleading. It fucked up my digestion, energy, mood, brain fog, anxiety, etc. Fuck kratom, and fuck those who peddle it as a harmless cure-all**." (emphasis added)

About 10 months ago, another user wrote: "For any newcomers: this stuff is absolutely no joke. It's not harmless and the wd [withdrawal] is *definitely* **not** like caffeine. I've cold turkey'd caffeine before and I had a slight headache for a couple hours. I definitely have never woken up in a pool of my own sweat from not having my caffeine. … **This stuff is a drug. A serious drug. And it's super freakin addictive**. *Extracts, powder, or in my case, capsules…it doesn't matter*. Yes some forms are more addictive than others but the WD is hellacious no matter how you're taking it." (emphasis added).

About 10 months ago, another user wrote: "This stuff is a drug, and dangerous! **I started taking it because of all the good things I heard and read about it**. I've never been addicted to or dependent on anything before, but this stuff has totally taken control of my life." (emphasis added).

About 9 months ago, another user wrote: "I finally realized a few weeks ago how much of a negative impact kratom was having on my life. I noticed myself planning my whole day around my doses and making sure when I left the house I'd bring an extra dose with me in a shaker bottle. It was heavily affecting my mood overall, but

especially in public settings.  I did not want to leave my house most days even if I did dose."

34.    The reports from people addicted to 7-OH on kratom forums are even worse:

In one post titled **Do no take 7oh**, a user wrote: I'm going to say this loud and clear for everyone in their early stages of quitting, currently, or have already quit. DO NOT take this 7oh shit. It's fucking poison. It's nothing like the extracts and it's a very VERY taxing drug on the body. I have done every single thing under the sun and I can honestly say with confidence that this is by far bar none the absolute worst drug I've ever taken when it comes to detoxing.

In another post titled **Beware of 7-Hydroxymitragynine,** a user wrote: I ended up getting these extract pills that were 14mg of 7 Hydroxymitragynine per pill. Used them for about a week for some bad pain, and then got thrown into aggressive withdrawal. I've been on a now 3 month taper journey off of just a week of using them. It's been hell. Trying to get there slowly tapering. Just wanted to put the PSA out there, something like [7-OH] might be tempting, and it is incredible for pain, but it threw me into awful withdrawal that's now forced me to have to taper off of it and take a dose every 12 hours. This was after 2 and a half years of regular Kratom use that never gave me withdrawal. This week of using [7-OH] though mixed with my 2 and a half years of Kratom experience created a withdrawal shitstorm that was never expected. Beware.

    i.   **Another user responded**: I don't know how you're cold turkey from [7-OH], I tried and it was worse than when I had to kick morphine. I've had to do a long and slow taper with 6grams of Kratom powder every 12 hours currently. The [7-OH] withdrawal is very scary, worse than any opiate I've been on.

    ii.   **Another User Responded**: I started taking those because the guy suggested them now it's every day for 3 months. I can't stop and get bad withdrawals at 24 hr mark. I'm taking about 6 a day now and I'm spending over 1K per month now it's going to ruin me if I don't stop. I can't believe this is legal, idk what to do

In separate post another user wrote: Guys I desperately need help. I have been taking [7-OH] for maybe 6 months. Like more than three a day. The more research I do on them the more I realize they're not even Kratom and no one scientifically really knows anything about them. I am going across the country tomorrow and am going to be CT for 8 days. I actually really want to stop and I've been trying to for a really long time, but I am terrified of the withdrawals. I don't know what to do. I actually upped my dose this week and have probably been taking more like five a day. I am so embarrassed to say that, I am now realizing that everyone is cautioning even the fucking American Kratom Society about these things. I'm really worried about my mental health not to mention I am going to be with my wife/kids and parents for 8 days. I don't know what I was thinking. Any recommendations?

In another post titled **Could not and would not believe you all…**another user wrote: Long time lurker, first time poster. I went CT three days ago… after using for 1 1/2 years. The last 3 months I've been exclusively abusing the [7-OH] tablets, a full pack of three a day. I told myself you were all exaggerating.  I told myself you were all weak.  Now I'm completely humbled and fully ashamed.  The last three days I've experienced a fatigue and fever like I've never experienced before. Trying to fall asleep and stay asleep, is absolutely impossible. During the night I sweat through my sheets…during the day I feel like a walking corpse.  And I caved.  I took half a tablet today just to stop the WD symptoms I was feeling. Now my brain just wants to rationalize what I've done. But I know, deep down this was the wrong move…I'm truly ashamed.  I share this post for the people like me, who are lurking or glancing at this subreddit from time to time and telling themselves "naw I'll be fine…I can handle the WD whenever I decide or if I ever stop." I share this post for future me to look at to read and see the seriousness of my addiction and situation. I know that next time I quit I need to be more prepared.  If you abuse it the way I do…Kratom is robbing you of life, and you trade it willingly for a 2 hour high.  There's so much more to life than getting high.  Thank you to this community, I hope you all know how much reading your stories and struggles does for someone like me. Thank you 🙏🏼

35.     Internet forums are filled with accounts just like these.  The stories are consistent – well-meaning people who were looking to feel better, in mind body and spirit, by taking an "herbal supplement," only to end up with an opioid-like addiction.

36.     What is particularly insidious about kratom is that, at the early stages, many users are unaware of its negative side effects and its addictive potential, so when they begin to experience the consequences of addiction, they do not attribute it to the kratom.  Rather, they take more of the substance thinking that it is helping them with their malaise.

37.     As these accounts make clear, the addictive potential of kratom is a material fact to reasonable consumers which would help inform their purchase and consumption decisions. Defendant's Products have no warnings, whatsoever, that kratom is similar to an opioid, is habit-forming, and that regular use will result in opioid-like dependency with withdrawal symptoms similar to those of traditional opioids.

38.     Consumers who knew the truth about kratom would not have purchased Defendant's Products or would have paid less than they did for them.

**C.    Defendant Knew or Should Have Known It Was Selling a Highly Addictive Drug to Unsuspecting Consumers**

39.    Despite its traditional medical uses, kratom dependence has been known and observed for a long time and is well-documented in Southeast Asia, where the plaint originates and has the longest history of use.  Addiction to kratom among users in Thailand, Indonesia, and Malaysia has been documented by scientists and researchers in the United States since at least 1988.

40.    To reiterate, this is not an instance where scientific merit is still up for debate. Western civilization has known for decades that kratom is highly addictive and has the potential to cause physical and psychological dependence in regular users.  In Southeast Asia, it has been known for over a century that kratom is addictive.  For example, a 2007 study found that 2.3% of people in Thailand have used kratom, and that many of those users developed a dependence on kratom to avoid withdrawal.

41.    Similarly, in America, the DEA and FDA have both stepped in and stated that kratom is addictive.[7]

42.    However, despite the fact that kratom's addictive potential has been known in the *scientific community*, does not mean that the general public is aware of it.  Indeed, most consumers do not know what kratom is and have no idea how addictive it is.

43.    Defendant operates under the brand name Bumble Bee Botanicals.

44.    Defendant sells a range of kratom powders, capsules, extracts, and 7-OH Products.

45.    Defendant markets its kratom powders as offering its customers the chance to "[d]ive into the natural potency and versatility of strains like Red Vein, Green Maeng Da, White Maeng Da, and Gold Bali – the kratom world is your oyster."[8]

---

[7] *See Kratom (Mytragyna speciosa korth),* DEA, April 2025 (accessible at: https://www.deadiversion.usdoj.gov/drug_chem_info/kratom.pdf); *FDA and Kratom*, FDA, (accessible at: https://www.fda.gov/news-events/public-health-focus/fda-and-kratom).

[8] BUMBLE BEE BOTANICALS, https://bumblebeesd.com/kratom-san-francisco (last accessed July 7, 2025).

46.    Defendant markets its kratom pills and capsules by encouraging its customers to "[g]et ready to experience ultimate convenience and precision with our easy-to-take capsules and tablets – they're a total game changer!"[9]

47.    Defendant markets its kratom liquids, or drinks, as providing customers with an opportunity to "[t]reat yourself to premium extracts, specifically crafted to pack a powerful punch of beneficial alkaloids – its like a kratom cocktail but way better!"[10]

48.    Defendant markets its kratom extracts as providing its customers with the opportunity to "[d]ive into the intense potency of kratom extracts, seamlessly blending into your daily routine – it's like magic in a bottle!"[11]

49.    Defendant offers these Products in the following varying strains: Red Maeng Da Kratom, Red Bali Kratom, Red Bentuangie Kratom, Red Borneo Kratom, Green Maeng Da Kratom, Green Malay Kratom, Green Hulu Kapuas Kratom, Green Borneo Kratom, Green Bali Kratom, Gold Bali Kratom, White Maeng Da Kratom, White Thai Kratom, and White Borneo Kratom.

50.    Defendant also sells highly concentrated 7-OH Products.  Defendant markets these with statements like "We believe in going beyond generic. Our Bee Line 7OH products are the result of direct feedback from real people—customers and employees—combined with nootropics, adaptogens, and amino acids for a holistic approach to wellness."[12]

51.    However, no matter what Product consumers take, however, they are exposed to significant levels of addictive alkaloids, a fact which Defendant knows and yet even tries to maximize the addictive nature of kratom.

52.    For example, kratom extracts are a concentrated form of kratom, whereby the active kratom alkaloids (MG and 7-OH included) are distilled from the leaf and sold in powder or liquid preparations.

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *7OH Tablets & Store in San Francisco, CA*, BUMBLE BEE BOTANICALS, https://bumblebeesd.com/7oh-san-francisco (last accessed July 7, 2025).

53.     The purpose of kratom extracts is to create a vastly more potent product as there is a greater concentration of MG and 7-OH, and all other alkaloids, by weight compared to regular powder kratom.

54.     Similarly, to manufacture 7-OH Products, Defendant must use a highly specialized lab and highly technical knowledge about kratom and its alkaloids to synthesize its 7-OH Products. Thus, Defendant is acutely aware of the addiction risks posed by its Products.

55.     Upon information and belief, Defendant has interacted with growers and distributors in Southeast Asia who have disclosed the addictive nature of kratom.

56.     Even without such interactions, Defendant has received numerous user reports about the addictive potential of kratom in the United States

57.     Moreover, the very fact that Defendant possesses the capability to manufacture its 7-OH Products shows that it understands the pharmacokinetic nature of both kratom and 7-OH and the substantial risk of addiction that both alkaloids pose to consumers.

58.     Despite this, Defendant markets its Products as if they are nothing more than over-the-counter "holistic" supplements that support "wellness."  Indeed, the stock packaging on the website looks more like an herbal health food supplement than a dangerously strong opioid, and Defendant's glossy website and design language obfuscates the very truth that it is selling a strong narcotic to consumers who likely do not fully comprehend the risks associated with consuming the Products.

59.     Defendant therefore knew or should have known that the Products it sells are highly addictive.

60.     Despite this knowledge, Defendant has failed to disclose the addictive potential of kratom in its stores, on the Bumble Bee Botanicals website, or on the Products' packaging.

61.     The Products' packaging is has varied in appearance throughout the Class Period. Defendant's website shows a white bottle with natural imagery (*see* below), but when Plaintiff visited the San Francisco storefront, he has only ever received the Products in a brown paper bag and does not recall seeing any text or labeling regarding the addictive nature of the Products.



62.     Plaintiff is informed and believes that recently, Defendant has slapped a sticker on the packaging adding a disclaimer regarding the addictive potential of the Products that reads "**Use Responsibly**: Kratom (Mitragyna Speciosa *may* be habit-forming if used excessively or irresponsibly.  To reduce the risk of dependency, use in moderation and avoid frequent or excess servings over extended periods." (Emphasis added.)

63.     However, this disclaimer fails to provide consumers with any context as to how much of the Products must be consumed to be habit forming nor does the disclaimer inform consumers that *any* use of the Products can lead to dependency.

64.     Nevertheless, no matter the appearance, the Products' information is woefully sparse and seems deliberately designed to convey as little information as possible.

65.     The stock photo packaging evokes a connection to nature through its botanical imagery and pictures of bees.

66.     There is no warning on any of the packaging iterations to consumers that the Products interact with opioid receptors, nor is there any warning that the Products are highly addictive and should not be taken on a daily basis.

67.     Further, the stock packaging itself is innocuous and sleek with the substantial use of white and blue evoking in the mind an idea of a "clean" herbal supplement.

68.     Whether the advertised stock packaging, or a brown paper bag, nothing about the packaging would lead reasonable consumers to believe that they were purchasing compounds similar to opioids, that act on the same mu-opioid receptors in the brain as opioids do.  Therefore, reasonable consumers looking at the Products' packaging would not presume that kratom is highly addictive.

69.     Defendant's website is sparse as well, with the only text being warm and fuzzy claims providing misleading information about the impact kratom has on the human body.



**ABOUT BUMBLE BEE BOTANICALS**

We believe in the healing power of plants. There is a lot of misinformation out there about kratom. So much so that it can be hard to know what's true and what's not. While kratom hasn't been studied extensively by the medical community in the US, it has been used as medicine in Southeast Asia for centuries with great success! Millions of people in the United States are quickly becoming advocates as they see the positive impact that kratom is having on their community. Our goal is to provide a warm & welcoming place to buy kratom.

70.     Indeed, Defendant even informs consumers that "[t]here is a lot of misinformation out there about kratom" but instead of telling consumers the truth, Defendant then uses consumers' misunderstanding and lack of knowledge against them.

71.     By using phrases like "the healing power of plants" and "a holistic approach to wellness," Defendant downplays the seriousness of the drug it is selling to consumers and instead attempts to conjure an impression of kratom as a magical alternative to pharmaceuticals that will

promote wellbeing.  Such language is deceitful and harmful to consumers, who rely on Defendant's Product statements when making their purchasing decisions.

72.     Nowhere does Defendant mention that kratom presents the same addiction problems that former opioid users and other consumers would want to avoid.

73.     Finally, even Defendant's brick-and-mortar store fronts, which are the only places the Products can be purchased, are fashioned to look like an upscale health foods store.  The sleek design and apothecary aesthetic evokes in the mind a sense of traditional herbalism that is beneficial to one's health.  Below is a representative photo of one of Defendant's store fronts from their website.



74.     When consumers think of buying opiate like substances, they picture back-alleys and sketchy rooms, not a bright hygge style store around the corner.  Therefore, consumers would never expect that Defendant's Products are so addictive.

75.     Addiction is a disease, a medical condition.  Thus, any product which carries an addiction risk poses a concurrent health hazard, which is a material fact to consumers.

Accordingly, Defendant's Products carry the threat of an unreasonable health hazard which Defendant was obliged to disclose to consumers on the Products' packaging.

76.     Further, those seeking help as they come off opioids may be drawn in by Defendant's statements about kratom without knowing that they risk trading one addiction for another. Defendant has an obligation not only to remove such harmful statements from its website, but to warn consumers about the potential risks of taking kratom and to provide such a warning on the Products' labels.

77.     The consequences of kratom addiction are not mild: "in humans, opioid-like withdrawal symptoms have been reported following cessation of kratom use," though "the withdrawal syndrome appears to be less severe than withdrawal from morphine."

78.     While kratom withdrawal may be "less severe" than morphine withdrawal, that is hardly a seal of approval – morphine withdrawal is one of the most unpleasant experiences that one can endure in modern life. And kratom withdrawal, while perhaps "less severe" than morphine withdrawal, is still an "opioid-like withdrawal" (according to the World Health Organization), with the same physical and mental symptoms.

79.     The risk of "opioid-like withdrawal symptoms" is a material fact to reasonable consumers.

80.     As a kratom product manufacturer and distributor, Defendant occupied a position of superior knowledge to the average reasonable consumer, who likely knows next to nothing about kratom.

81.     Defendant, through its misleading advertising and failure to disclose kratom's addictive properties on the Products' labels, relied upon the average consumer's incomplete knowledge of kratom to sell its Products and get users addicted to kratom.

82.     Defendant fails to disclose kratom's addictive potential because Defendant knows that it is a material fact to reasonable consumers which would influence their purchasing and consumption decisions, likely to Defendant's detriment.

83.     By any metric, Defendant's conduct is immoral, unethical, and contrary to California public policy.

84.    The United States is going through an opiate crisis that is shaking the foundations of our society.  Amidst this crisis, Defendant is creating more addicts for no reason other than to line its pockets, without adequate disclosures of its Products' risks and through the use of false and misleading packaging.  That cannot – and should not – be allowed.

85.    Accordingly, because the facts concern a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and the members of the Classes the true standard, quality, and grade of the Products and to disclose the Products are—or potentially are—addictive.  Defendant also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Products as the owner, manufacturer, producer, marketer, and seller of the Products.  Nonetheless, Defendant concealed this material information.

### D.    Plaintiff Hackett's Experience

86.    Plaintiff Hackett first purchased the Products in or around September 2019.  Mr. Hackett visited Defendant's San Francisco location and, prior to his purchase, saw Defendant's kratom powder on the shelf and inquired about it.  He was told by an employee of Defendant that kratom was a natural substitute for medication to manage sickle cell anemia.  Mr. Hackett stated he did not want to take anything addictive, but he was assured that Defendant's Products were not addictive.

87.    Mr. Hackett used the Products with no realization he had an addiction until November 2024 when Mr. Hackett attempted to use less of the Products.  Once he did so, Mr. Hackett experienced severe withdrawal symptoms including stomach issues, vomiting, vision impairment, and headaches.  This was the moment Mr. Hackett realized Defendant did not tell the truth about the Products, and that he had become addicted to them.  Had he known that Defendant's Products were highly addictive, by way of a warning on the Products' packaging, he would have never purchased the Products.

88.    Since 2019, Plaintiff Hackett has visited that San Francisco location at least twelve to thirteen times a year.  Each time he spends between $100 to $150 dollars purchasing Defendant's powdered kratom Products, most frequently Gold Bali and Green Borneo.

89.    Plaintiff Hackett's story is like countless others.  Defendant does nothing to inform consumers about the risks of consuming the Products.  As a result of the omission of any information related to the highly addictive nature of kratom, Plaintiff Hackett assumed that the Products were safe to consume and would not lead to addiction.  However, contrary to Defendant's representations and omissions, Plaintiff Hackett was not informed that Defendant's Products may be toxic and detrimental to his health.  Plaintiff Hacket's harm is ongoing because while he would like to stop consuming kratom, he has been unable to thus far due to the addictive nature of the Products.

90.    As Plaintiff Hackett's experience makes clear, it is incumbent upon Defendant as the seller of these Products to provide clear and conspicuous disclosures on the Products' labels about the risks presented by kratom use.  Defendant has made no such disclosures despite knowing that omitting said disclosures poses a material risk that consumers may become addicted to the Products.

## FRCP 9(b) PARTICULARITY ALLEGATIONS

91.    Although Defendant is in the best position to know what content it placed on its packaging during the relevant timeframe, and the knowledge that Defendant had regarding the addictive nature of the Products that rendered its representations misleading, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

92.    **WHO**:  Defendant made material misrepresentations and omissions of fact about the Products through its labeling which by failing to disclose that the Products are addictive.  These representations constitute omitted material information regarding the nature of the Products.

93.    **WHAT**:  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products are highly addictive.  Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are not addictive.  Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products in this manner in the U.S. market to optimize its profits.  Moreover, beyond

Defendant's omission, Defendant also marketed the Products as "magical" and providing "a holistic approach to wellness," among other things. This combined with Defendant's natural packaging, hygge stye bodega store fronts, and similar representations positions Defendant's Products as if they are non-addictive herbal supplements.

94. **WHEN**: Defendant made material misrepresentations and omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, and/or discovered that the Products are addictive, despite its knowledge that the Products are highly addictive.

95. **WHERE**: Defendant's marketing messages were uniform and pervasive, carried through material misrepresentations and omissions on the labeling of the Products' packaging, website, and through marketing materials.

96. **HOW**: Defendant made material misrepresentations and omissions of fact regarding the Products, including the addictive nature of the Products.

97. **WHY**: Defendant made the material misrepresentations and omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

98. **INJURY**: Plaintiff and Class Members purchased, paid a premium (up to the full-price), or otherwise paid more for the Products when they otherwise would not have absent Defendant's misrepresentations and omissions.

## CLASS ACTION ALLEGATIONS

99. ***Class Definition***. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of himself and all other similarly situated consumers, and seek to represent a class (the "**Class**") defined as:

> All persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased Bumble Bee Botanicals products

100.    Plaintiff also seeks to represent a subclass of all Class members who purchased the Products in California, within the applicable statutory period (the "**California Subclass,**" collectively, together with the **Class**, the "**Classes**").

101.    Specifically excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest; Defendant's agents and employees; the judge to whom this action is assigned; members of the judge's staff; and the judge's immediate family.

102.    Plaintiff reserves the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

103.    ***Numerosity.***  Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, the Classes comprise of at least thousands of consumers throughout California and the United States.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

104.    ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

  a. whether the labels on Defendant's Products have the capacity to mislead reasonable consumers;

  b. whether Defendant knew that kratom is a highly addictive substance;

  c. whether Defendant had a duty to inform consumers about the risks inherent to consumption of the Products;

  d. whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq*., California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*., and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.;

  e. whether Defendant's conduct alleged herein constitutes unjust enrichment;

  f. whether Defendant's conduct constitutes negligent omission;

  g. whether Plaintiff and the Classes are entitled to damages and/or restitution; and

  h. whether Plaintiff and the Classes are entitled to attorneys' fees and costs.

105.    ***Typicality.***  Plaintiff's claims are typical of the claims of the Classes in that Plaintiff and the Classes sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to inform Plaintiff and all others similarly situated that the Products are highly addictive and operate similarly to opioids.

106.    ***Adequacy.***  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that has considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

107.    ***Superiority.***  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Classes; the Classes are readily definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

108.    Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Classes and will likely retain the benefits of their wrongdoing.

109.    Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## COUNT I
### Violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof Code § 17200, *et seq.*

110.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

111.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

112.    The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any

act." Cal. Bus. & Prof. Code § 17200. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

113.    As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by: (a) representing that Defendant's Products have certain characteristics that they do not, in fact have, thereby violating Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); (c) selling addictive substances to unsuspecting consumers and profiting from their addiction; and (d) failing to disclose that the Products pose a serious risk of addiction;

114.    Defendant's conduct has the capacity to mislead a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances.

115.    Defendant's conduct has injured Plaintiff and the California Subclass he seeks to represent in that they paid money for a product that they would not have purchased or paid more than they would have but for Defendant's failure to disclose the addictive nature of the Products. Such injury is not outweighed by any countervailing benefits to consumers or competition. Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's labels, and thus also its omissions, consumers could not have reasonably avoided such injury. *See Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th 581, 597-98 (2009); *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (outlining the third test based on the definition of "unfair" in Section 5 of the FTC Act).

116.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass members seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Subclass members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff and the California Subclass members' attorneys' fees and costs.

117.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

**COUNT II**
**Violation of California's Consumer Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code § 1750, *et seq.***

101.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

118.    Plaintiff brings this claim individually and on behalf of the California Subclass against Defendant.

119.    Plaintiff and California Subclass Members are consumers within the meaning of California Civil Code § 1761(d).

120.    California Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which she or she does not have."

121.    California Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

122.    California Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

123.    Defendant violated California Civil Code §§ 1770(a)(5), (a)(7), and (a)(9) by intentionally and misleadingly representing that the Products are "all natural" and by failing to disclose that the Products are addictive, a fact which is material to reasonable consumers such as Plaintiff and the California Subclass members.

124.    Defendant's misrepresentations and omissions deceive and have a tendency and ability to deceive the general public.

125.    Defendant has exclusive or superior knowledge of kratom's addictive nature, which was not known to Plaintiff or the California Subclass members.

126.    Plaintiff and California Subclass members have suffered harm as a result of these violations of the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA") because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid had they known that kratom is addictive and causes withdrawals.  As a result, Plaintiff and the California Class are entitled to actual damages in an amount to be proven at trial, reasonable attorneys' fees and costs, declaratory relief, and punitive damages.

127.    In compliance with the provisions of California Civil Code § 1782, Plaintiff sent written notice to Defendant, and its agents, on March 05, 2025, informing Defendant of his intention to seek damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt requested, advising Defendant that it isin violation of the CLRA and demanding that it cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly situated."

## COUNT III
### Breach of Implied Warranty

128.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

129.    Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

130.    This claim is brought pursuant to the laws of the State of California.

131.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller of the Products, impliedly warranted that that kratom is not addictive and does not cause opioid-like withdrawal symptoms.

132.    Defendant breached this warranty implied in the contract for the sale of its kratom Products because the Products could not pass without objection in the trade under the contract description: the kratom Products were not adequately contained, packaged, and labeled as per

Defendant's contract with Plaintiff and members of the Classes, and the Products do not conform to the implied affirmations of fact made on the marketing and packaging for the Products that the Products are not addictive and do not cause withdrawals.  U.C.C. §§ 2-313(2)(a), (e), (f).  As a result, Plaintiff and members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

133.    Plaintiff and members of the Classes purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

134.    The kratom Products were defective when they left the exclusive control of Defendant.

135.    Plaintiff and members of the Classes did not receive the goods as warranted.

136.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and members of the Classes have been injured and harmed because (a) they would not have purchased Products on the same terms if they knew that the Products were addictive and could cause opioid-like withdrawal symptoms; and (b) the Products do not have the characteristics, uses, or benefits as promised by Defendant.

137.    On March 5, 2025, prior to filing this action, Defendant, and its agents, was mailed pre-suit notice letters on behalf of Plaintiff that complied in all respects with U.C.C. §§ 2-314 and 2-607.  Plaintiff's counsel sent Defendant a letter advising Defendant that it breached an implied warranty and demanded that Defendant cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

## COUNT IV
### Unjust Enrichment

138.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

139.    Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

140.    Plaintiff and the members of the Classes conferred a benefit on Defendant in the form of the gross revenues Defendant derived from the money paid to Defendant for the Products.

141.    Defendant had an appreciation or knowledge of the benefit conferred on it by Plaintiff and the members of the Classes.

142.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff and the Class members' purchases of the Products, which retention of such revenues under these circumstances is unjust and inequitable because Defendant omitted that the Products were addictive and similar to opioids.  This caused injuries to Plaintiff and members of the Classes because they would not have purchased the Products or would have paid less for them if the true facts concerning the Products had been known.

143.    Defendant accepted and retained the benefit in the amount of the gross revenues it derived from sales of the Products to Plaintiff and the members of the Classes.

144.    Defendant has thereby profited by retaining the benefit under circumstances which would make it unjust for Defendant to retain the benefit.

145.    Plaintiff and the members of the Classes are, therefore, entitled to restitution in the form of the revenues derived from Defendant's sale of the Products.

146.    As a direct and proximate result of Defendant's actions, Plaintiff and the members of the Classes have suffered in an amount to be proven at trial.

147.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Product is determined to be an amount less than the premium price of the Product.  Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

148.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein.  The return of the full premium price will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., in the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

## COUNT V
### Fraud by Omission

149.  Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

150.  Plaintiff brings this claim individually and on behalf of the Classes against Defendant.

151.  Defendant distributed their Products throughout the State of California.

152.  Defendant misrepresented that its kratom Products have attributes or qualities that they do not have by failing to disclose that kratom is addictive and can cause opioid-like withdrawal.

153.  Defendant knows that kratom is addictive because it interacts with kratom vendors, has been made aware of user reports, and has fully characterized kratom's alkaloids and created advanced extraction methods.

154.  Defendant knows that knowledge of kratom's addictive nature is a material fact that would influence the purchasing decision of reasonable consumers.

155.  The average reasonable consumer in the kratom purchasing context does not know that kratom is addictive and cannot reasonably access that information.

156.  Defendant therefore had a duty to Plaintiff and the members of the Classes to disclose that kratom is addictive and can cause withdrawals on the Products' packaging.

157.  Consumers reasonably and justifiably relied on Defendant's omission because it is reasonable to assume that a product which is addictive like an opioid would bear some kind of a warning.

158.  As a result of Defendant's omissions, Plaintiff and the members of the Classes paid for kratom Products they would not have purchased.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.  For an order certifying the Classes and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel to represent the Classes;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief; and

g.    For an order awarding Plaintiff and the Classes their reasonable attorneys' fees, expenses, and costs of suit

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated:  July 9, 2025                          Respectfully submitted,

                                              **BURSOR & FISHER, P.A**.

                                              By: ____*/s/ Ryan B. Martin*_____
                                                        Ryan B. Martin

                                              Neal J. Deckant (State Bar No. 322946)
                                              Luke W. Sironski-White (State Bar No. 348441)
                                              Ryan B. Martin (State Bar No. 359876)
                                              1990 North California Blvd., 9th Floor
                                              Walnut Creek, CA 94596
                                              Telephone: (925) 300-4455
                                              Facsimile:  (925) 407-2700
                                              E-mail: ndeckant@bursor.com
                                                          lsironski@bursor.com
                                                          rmartin@bursor.com

                                              *Attorneys for Plaintiff*

1

2
## <u>CLRA VENUE DECLARATION</u>

3
I, Ryan B. Martin, declare as follows:

4
1.      I am an attorney at law licensed to practice in the State of California and a member

5
of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., counsel of record for Plaintiff.

6
Plaintiff Hackett resides in Manteca, California.  I have personal knowledge of the facts set forth in

7
this declaration and, if called as a witness, I could and would competently testify thereto under

8
oath.

9
2.      The Complaint filed in this action is filed in the proper venue for trial under Civil

10
Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred

11
in the Northern District of California, as Plaintiff Hackett resides in this District and purchased the

12
Products from a store in this District.  Additionally, Defendant advertises, markets, manufacturers,

13
sells, and distributes the Products at issue to Class Members in this District.

14
3.      I declare under penalty of perjury under the laws of the State of California and the

15
United States that the foregoing is true and correct, and that this declaration was executed in San

16
Francisco, California this, 9th of July, 2025.

17

18
                     */s/ Ryan B. Martin*
                       Ryan B. Martin

19

20

21

22

23

24

25

26

27

28